COURT OF APPEALS
DECISION
DATED AND FILED

July 15, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP952-CR**

Cir. Ct. No. **2018CM937**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

AARON MATTHEW OLESTON,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Rock County: JOHN M. WOOD, Judge. *Affirmed in part; reversed in part.*

¶1     GRAHAM, J.[1]  Aaron Matthew Oleston appeals a judgment of conviction for five counts of disorderly conduct.  He argues that the conduct for

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

which he was convicted is protected by the First Amendment of the United States Constitution.[2] I conclude that the conduct at issue in counts one, two, and three cannot be criminally prosecuted because it is constitutionally protected speech. However, I conclude that the First Amendment does not protect the conduct at issue in counts four and five. Accordingly, I affirm in part and reverse in part.

## BACKGROUND

¶2 Oleston's disorderly conduct convictions stem from his interactions with officers of the Janesville Police Department in August 2018. The following facts are straightforward and, for the most part, undisputed.[3]

¶3 On August 13, 2018, Oleston positioned himself on the sidewalk near the north garage entrance to the police station. Using a video camera, he recorded his interactions with officers as they entered and exited the station. These interactions, which are discussed in greater detail below, constitute the basis for the first four counts of disorderly conduct.

¶4 Two days later, on August 15, 2018, Oleston resumed his position near the station's garage entrance, and once again, recorded his interactions with officers. At one point, Oleston noticed that a vehicle belonging to an officer did

---

[2] Oleston also cites to Article I, Section 3 of the Wisconsin Constitution. However, he does not argue that the Wisconsin Constitution offers any protection beyond that provided by the First Amendment, and therefore, I refer to the First Amendment throughout this opinion.

[3] There are minor differences among the criminal complaint, Oleston's video recordings, and officers' trial testimony regarding the precise wording of Oleston's statements. These minor variations do not change the general nature of the statements in question and do not affect the outcome of this appeal.

not have a front license plate.[4]   Oleston approached the officers, and his interactions with them, also discussed in detail below, constitute the basis for the fifth count of disorderly conduct and an additional count of obstructing a police officer in violation of WIS. STAT. § 946.41(1).

¶5     Oleston filed a motion to dismiss all of the charges on First Amendment grounds.  The circuit court denied the motion and the case proceeded to a trial.  After the officers testified about their interactions with Oleston on the dates in question and the State rested its case, Oleston moved for a directed verdict.  He challenged the sufficiency of the evidence and again argued that the charges should be dismissed on First Amendment grounds.  The court denied that motion.

¶6     Oleston testified in his defense.  On cross-examination, the State confronted Oleston with commentary he had posted on the internet, which suggested that he intended to provoke a reaction from the off-duty officers.

¶7     The jury found Oleston guilty of each of the five counts of disorderly conduct and not guilty of obstructing a police officer.  Oleston appeals.

## DISCUSSION

¶8     When a defendant is charged with disorderly conduct under WIS. STAT. § 947.01, the State must prove two elements:  (1) the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct; and (2) the defendant's conduct occurred under circumstances

---

[4] The parties do not dispute that the vehicle that Oleston referenced was a municipal vehicle, and consequently, did not require a front license plate pursuant to WIS. STAT. § 341.15.

where such conduct tends to cause or provoke a disturbance. ***State v. Douglas D.***, 2001 WI 47, ¶15, 243 Wis. 2d 204, 626 N.W.2d 725 (citing ***State v. Zwicker***, 41 Wis. 2d 497, 514, 164 N.W.2d 512 (1969)). Oleston does not meaningfully dispute that the State met its burden to prove both elements for each of the five charged counts of disorderly conduct.

¶9 However, as I now explain, the State shoulders an additional burden when the alleged disorderly conduct involves speech that may be protected under the First Amendment. It is this additional burden that is the primary subject of the parties' dispute.

¶10 Broadly speaking, the First Amendment guarantees the right to free speech, but that right "is not absolute at all times and under all circumstances." ***Chaplinsky v. State of New Hampshire***, 315 U.S. 568, 571 (1942). The constitutionality of WIS. STAT. § 947.01 has been challenged in cases where the alleged disorderly conduct involves speech. *See, e.g.*, ***Zwicker***, 41 Wis. 2d 497; ***State v. A.S.***, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712; ***Douglas D.***, 243 Wis. 2d 204. The disorderly conduct statute has survived as-applied constitutional challenges, and our supreme court has determined that it is not overbroad. ***Zwicker***, 41 Wis. 2d at 508-13. However, in so doing, to save its constitutionality, our supreme court has construed the statute to not penalize conduct that is "speech alone" if that speech is protected by the First Amendment. ***Douglas D.***, 243 Wis. 2d 204, ¶21 n.6 (recognizing that the court is applying a limiting construction to preserve the constitutionality of the statute).

¶11 In other words, "speech alone" may be penalized as disorderly conduct *only if* it falls into one of the narrow and limited categories of speech that the First Amendment does not protect. ***A.S.***, 243 Wis. 2d 173, ¶16. These

categories of unprotected speech include "fighting words," *see **Chaplinsky***, 315 U.S. 568; speech that incites others into imminent lawless action, *see **Brandenburg v. Ohio***, 395 U.S. 444, (1969); obscenity, *see **Miller v. California***, 413 U.S. 15, (1973); libel and defamatory speech, *see **New York Times Co. v. Sullivan***, 376 U.S. 254 (1964); and "true threats," *see **Watts v. United States***, 394 U.S. 705 (1969).

¶12   Accordingly, when the State attempts to prosecute "speech alone" as disorderly conduct, it must also prove that the speech at issue is not constitutionally protected and is therefore "within the punitive reach of WIS. STAT. § 947.01." ***Douglas D.***, 243 Wis. 2d 204, ¶25.  The parties dispute whether the State met its burden to prove that Oleston's speech is not constitutionally protected.  Neither party suggests that the jury should have been instructed on any First Amendment issues, or that resolution of their dispute turns on any question of fact.[5]  Instead, both parties suggest that I may determine whether Oleston's alleged disorderly conduct is unprotected by the First Amendment as a question of law.

¶13   For the reasons that follow, I conclude that the conduct charged as counts one, two, and three is protected by the First Amendment.  By contrast, I conclude that the conduct charged as counts four and five is not constitutionally protected, given the different circumstances surrounding those two counts.

---

[5] *Cf. **State v. Perkins***, 2001 WI 46, ¶48, 243 Wis. 2d 141, 626 N.W.2d 762 (in a case involving the exception for "true threats," the application of that exception was a question of fact to be decided by the jury).

## I. Counts One, Two, and Three

¶14     As discussed in greater detail below, the first three counts involve Oleston standing on a public sidewalk hurling profanities and personal insults at officers. I now provide additional detail about the charged conduct.

¶15     Count one relates to Oleston's interaction with Officer Daniel Schoonover. Officer Schoonover greeted Oleston as he was walking into the police station to begin his shift. Oleston responded by saying something like: "you work for this piece of shit organization" "you Nazi," "ISIS organization." Officer Schoonover did not respond to Oleston and continued to walk toward the building as Oleston shouted expletives.

¶16     Count two is based on a similar interaction with Officer Jeremy Wiley. Officer Wiley was walking into the station to begin his shift and said "hi" to Oleston. Oleston responded by saying: "I don't talk to terrorists," "so fuck you," "suck a dick," and "you fucking thug."

¶17     Count three involved Officers Robert Gruenwald and Bryan Naber, who were leaving the station at the end of their shifts. As they walked to their vehicles, Oleston asked them if they were janitors. When Oleston was told that they were officers, Oleston remarked, "oh, off duty." He then asked the officers if they were "going home to beat their wives," called them "assholes," and shouted expletives at them until they drove away.

¶18     The State contends that Oleston's speech is not constitutionally protected because it was, among other things, profane and constituted "fighting

6

words."[6]  Additionally, the State appears to argue that non-speech elements such as the location and volume of Oleston's speech can be constitutionally prosecuted as disorderly conduct, and that Oleston's speech interfered with the officers' "right to be let alone."  I address each of these arguments in turn, keeping in mind that the State bears the burden of proof.

*Profanity*

¶19     There can be no dispute that the speech underlying each of the first three counts was laced with profanity.  However, the State fails to develop any persuasive argument that Oleston's use of profanity, by itself, is sufficient to remove his speech from the protection of the First Amendment.

¶20     The State cites ***Lane v. Collins***, 29 Wis. 2d 66, 138 N.W.2d 264 (1965), but that case is inapt because the ***Lane*** court did not undertake any constitutional analysis.  In ***Lane***, our supreme court stated that calling a police officer a "son-of-a-bitch" might constitute disorderly conduct.  ***Id.*** at 72.  Yet, as discussed above, our supreme court has since explained that, even if speech satisfies the elements of disorderly conduct, it cannot be prosecuted as disorderly conduct unless it is unprotected speech.[7]  Simply stated, the ***Lane*** court was not

---

[6] The State also makes the conclusory assertion that Oleston's speech is unprotected because it was obscene and defamatory.  Yet the State fails to cite even one case that addresses either of these exceptions, much less develop any argument applying the legal framework for these exceptions to the facts of this case.  I address its assertions about obscenity and defamation no further.  *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (appellate courts need not address undeveloped arguments).

[7] *See **State v. Douglas D.***, 2001 WI 47, ¶¶ 39, 41, 243 Wis. 2d 204, 626 N.W.2d 725 (2001) (explaining that, even though a story written by a student satisfied the elements of disorderly conduct, his conviction must be overturned because the story did not rise to the level of a "true threat").

called to decide whether it would be constitutional to prosecute a defendant for uttering a profanity, nor did it weigh in on whether profanity is or is not constitutionally protected speech.

¶21    The State also cites *State v. Breitzman*, 2017 WI 100, 378 Wis. 2d 431, 904 N.W.2d 93, but that case cuts against the State's argument.    In *Breitzman*, the defendant had been charged with disorderly conduct for an incident in which she hurled a string of profanities at her teenage son and then threatened to kick him out of the house.  *Id.*, ¶18.  The question on appeal was whether her attorney was ineffective for not seeking to dismiss the charge on First Amendment grounds.  The court determined that the attorney was not ineffective "because whether profane conduct that tends to cause or provoke a disturbance is protected as free speech is unsettled law."  *Id.*, ¶41.  *Breitzman* does not help the State meet its burden to show that Oleston's use of profanity renders his speech unprotected; it instead underscores that the law is not settled in the State's favor.

¶22    Other than citing *Lane* and *Breitzman*, the State does not make any developed argument that profanity, by itself, is unprotected speech.  Nor does the State address Oleston's arguments about *Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (acknowledging that at least some "vulgar or offensive" speech is constitutionally protected) or *Cohen v. California*, 403 U.S. 15, 25 (1971) ("it is nevertheless often true that one man's vulgarity is another's lyric").  According to Oleston, these cases demonstrate that, as a general rule, simple profanity or vulgarity—not rising to the level of "fighting words"—is constitutionally protected speech.

¶23    I need not decide whether Oleston has correctly summarized the law or whether profanity, by itself, can ever be the basis for determining that speech is

unprotected. Given that the law is unsettled and due to the State's failure to present a developed argument, I decline to conclude that Oleston's use of profanity, by itself, is sufficient to remove his speech from the realm of protected speech.

*"Fighting words"*

¶24 I now turn to "fighting words," which is a recognized category of unprotected speech. The fighting words doctrine has its origin in *Chaplinsky*, in which the United States Supreme Court explained that certain words are unprotected because, "by their very utterance [they] inflict injury or tend to incite an immediate breach of peace." *Chaplinsky*, 315 U.S. at 572.

¶25 The speech at issue in *Chaplinsky* was similar to the speech in this case. In *Chaplinsky*, the defendant called a police officer "a god damned racketeer" and "a damned fascist," and then stated that "the whole government of Rochester are fascists or agents of fascists." *Id.* at 569. Chaplinsky was convicted of violating a statute that criminalized calling another by an offensive or derisive name on public streets, and the Court determined that the statute did not contravene the constitutional right of free expression. *Id.* at 569, 573.

¶26 Had the fighting words doctrine remained constant since *Chaplinsky* was decided in 1942, I would have no trouble determining that Oleston's speech is unprotected. However, the Supreme Court has limited its application in subsequent cases. *See, e.g.*, Rodney A. Smolla & Melville B. Nimmer, SMOLLA & NIMMER ON FREEDOM OF SPEECH: A TREATISE ON THE FIRST AMENDMENT § 10:33 (1994). In *Terminiello v. Chicago*, 337 U.S. 1, 4, (1949), for example, the Court explained that provocative and challenging speech is essential to urge people to act and think critically, and that constitutionally protected speech often

9

stirs people to anger. As the *Terminiello* Court explained, the fighting words standard requires a showing that the speech in question is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* And, in *Cohen*, 403 U.S. at 20, the Court limited "fighting words" to those "personally abusive epithets" that, "when addressed to the ordinary citizen, are ... inherently likely to provoke a violent reaction."

¶27 In furtherance of his argument that it is unconstitutional to penalize his speech as disorderly conduct, Oleston cites a number of cases from other jurisdictions in which insults hurled at police officers were determined to be protected speech. In *Buffkins v. City of Omaha*, 922 F.2d 465 (8th Cir. 1990), for example, Buffkins called the police officer who arrested him an "asshole," and he was prosecuted for disorderly conduct as a result. *Id.* at 467. The court reversed the conviction, holding that Buffkins's speech was not within the category of "fighting words" excluded from First Amendment protection. *Id.* at 472. The court reasoned that "there was no evidence that Buffkins's speech was an incitement to immediate lawless action." *Id.* There was also no suggestion that Buffkins became violent or threatened violence, and his use of the word "asshole" could not "reasonably have prompted a violent response from the arresting officers." *Id.*

¶28 In this case, the State's fighting words argument is woefully underdeveloped. The State cites *Chaplinsky*, but it fails to discuss that case at any length or apply it to the facts at hand. The State does not even mention *Terminiello*, *Cohen*, or *Buffkins*, nor does it attempt to demonstrate that the insults Oleston hurled at the officers were the type of "personally abusive epithets

which, when addressed to the ordinary citizen, are ... inherently likely to provoke a violent reaction." *Cohen*, 403 U.S. at 20.

¶29  There are a number of undisputed facts that appear to point away from a conclusion that Oleston's speech was inherently likely to provoke a violent reaction.  His speech may have been insulting and distasteful, but its content was relatively generic, and Oleston did not engage in a course of conduct that continuously targeted a specific person.  As in *Buffkins*, none of the officers indicated that Oleston became violent or threatened violence.  He kept a considerable distance from the officers—at times, more than seventy-five to one hundred feet away—and did not approach any of the officers.  In fact, the videotape demonstrates that the officers were simply walking around Oleston to avoid engaging with him.  Officer Wiley testified that Oleston's statements "offended" him, and several of the officers testified that Oleston's statements "disturbed" them.  However, "government may not prohibit the verbal or nonverbal expression of an idea simply because society finds the idea offensive," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), and the fighting words standard requires more than a showing that one has been "offended" or "disturbed" by speech, *supra* ¶26.

¶30  To meet its burden, the State was required to show that Oleston's speech was "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello*, 337 U.S. at 4.  The fighting words doctrine is limited and, given its failure to develop an argument addressing the legal standards and undisputed facts, I cannot

11

conclude that the State met its burden to prove that the statements charged in these three counts were "fighting words."[8]

*The "right to be let alone"*

¶31    The State cites ***Hill v. Colorado***, 530 U.S. 703 (2000) for the proposition that off-duty officers have a "right to be let alone."[9]  As I understand it, the State appears to argue that Oleston can be prosecuted because his speech violated the off-duty officers' rights not to have to hear what Oleston had to say, even if his speech would otherwise be protected by the First Amendment.

¶32    The State's reliance on ***Hill*** is misplaced.  The issue in ***Hill*** was the constitutionality of a Colorado statute that regulated speech-related conduct near the entrances of health care facilities.  ***Id.*** at 707.  Specifically, the statute made it unlawful to "'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person.'"  ***Id.***  Hill was a "sidewalk counselor" who attempted to counsel women as they entered abortion clinics, and she sought to enjoin enforcement of the statute on the ground that it violated the First Amendment.  ***Id.***

---

[8]  Citing ***Houston v. Hill***, 482 U.S. 451 (1987), and several other federal cases, Oleston asserts that "narrower application" of the fighting words exception is warranted because law enforcement officers are expected to exercise "a higher degree of restraint than the average citizen."  My determination that the State failed to meet its burden is not based on any distinction between officers and non-officers, and I do not consider whether Oleston has accurately summarized these cases.

[9]  The State inaccurately asserts that the right of an unwilling listener to be let alone is a constitutional right.  On the contrary, in ***Hill v. Colorado***, 530 U.S. 703, 717 n.24 (2000), the Court clarified that the so-called right "is more accurately characterized as an 'interest' that States can choose to protect in certain situations"—for example, with reasonable time, place, and manner restrictions.

at 708-09. The Supreme Court disagreed and upheld the statute's constitutionality. *Id.* at 735. It reasoned that, although the statute curtailed the freedom of speech, it did so with regard to speech directed at unwilling listeners as a proper content-neutral, reasonable time, place, and manner restriction. *Id.* at 718-19, 725.

¶33 In this case, by contrast, I am not asked to address the constitutionality of any statute containing a content-neutral time, place, and manner restriction. The State has not pointed to any statute or ordinance that prohibited Oleston from standing on the sidewalk where he made his remarks—there is no time, place, or manner restriction at issue in this case. And the prosecution appears to have been motivated by the content of Oleston's speech, which the officers found offensive and disturbing. I am sympathetic to the police department's desire to protect its employees from disrespectful speech. However, as the Court explained in *Hill*, the right to free speech "may not be curtailed simply because the speaker's message may be offensive to his audience." *Id.* at 716. Accordingly, I conclude that *Hill* is inapt, and I reject any argument based on that case.

*Non-speech elements*

¶34 Finally, the State argues that some of Oleston's comments were "loud," and further, that he was within "shouting distance" of apartment buildings, an elderly retirement home, and a public housing department building. But the State does not cite any case law on this topic and does not clearly explain why this matters. As best as I understand it, I take the State to be arguing that, even if the words Oleston was saying are protected, there were non-speech elements of Oleston's conduct that could be prosecuted as disorderly conduct.

¶35    As our supreme court has explained, "'unreasonably loud' speech—even if the words themselves are protected by the First Amendment—carries with it the non-speech element of excessive volume." *Douglas D.*, 243 Wis. 2d 204, ¶24.  Thus, consistent with the First Amendment, the conduct of shouting or yelling may be penalized under certain circumstances.  *Id.*; *see also* **State v. Becker**, 51 Wis. 2d 659, 664, 188 N.W.2d 449 (1971) ("Conduct which 'involves substantial disorder or invasion of the rights of others is … immunized by the constitutional guarantee of freedom of speech.'" (citing **Tinker v. Des Moines Indep. Cnty. Sch. Dist.**, 393 U.S. 503, 513 (1969))).

¶36    However, as with pure speech, the State has the burden to prove that Oleston's "unreasonably loud" statements are constitutionally unprotected conduct.  **Douglas D.**, 243 Wis. 2d 204, ¶25.  Here, there was scant evidence about the volume of Oleston's speech—officers merely testified that Oleston was "loud" and were not asked to elaborate further—and neither the circuit court nor the jury were asked to make any findings on this point.  Therefore, as to the first three counts, I conclude that the State failed to meet its burden to prove the existence of any non-speech elements of Oleston's conduct that can be prosecuted as disorderly conduct.

## II. Counts Four and Five

¶37    I now turn to counts four and five, which present a slightly different set of facts.

¶38    Count four involved Sergeant Chad Pearson, Officer Laura Smith, and Officer Bradley Rau, who were exiting the police station and walking toward their vehicles.  This time Oleston followed the officers on foot to their vehicles rather than remaining on the sidewalk.  Oleston yelled, "Are you having fun

14

fucking with peoples' lives?" He also yelled, "Citizens are forced to talk; we ask questions and you don't talk." As Officer Rau got into his vehicle, Oleston approached the passenger side front door and videotaped him until he drove off. Oleston was allegedly within five feet of the vehicle.

¶39 Count five occurred two days later and involved Officer Erin Betley, Officer Mario Vitaioli, and Officer Wiley. Oleston had resumed his position near the station's north garage entrance, again recording with his video camera. Officer Betley noticed Oleston using profane language as she pulled out of the station's garage. Oleston then started yelling that Officer Vitaioli's vehicle did not have a front license plate, and he demanded that Officer Betley "address the issue." Oleston subsequently moved to the curb line area and stuck his camera out in front of Officer Vitaioli's vehicle as he was attempting to leave. Officer Wiley advised Oleston that he was under arrest and asked him to put his camera down several times. According to Officer Wiley, Oleston did not comply with his instructions, and Officer Wiley had to physically remove the camera from Oleston's hand to place him into handcuffs. During the arrest and through the booking process, Oleston continued to shout expletives at the officers.

¶40 Contrary to the first three counts, I conclude that the conduct forming the basis of counts four and five includes non-speech elements that is not protected by the First Amendment and can be prosecuted as disorderly conduct. As discussed above, speech alone is generally not susceptible to criminal prosecution; penalizing conduct, however, is another matter. *See **Douglas D.***, 243 Wis. 2d 204, ¶16. Additionally, conduct may be penalized when it causes "'substantial disorder or the invasion of the rights of others.'" ***Becker***, 51 Wis. 2d at 664 (citing ***Tinker*** 393 U.S. at 513).

¶41 Here, as to counts four and five, Oleston's conduct "went beyond mere expression of ideas." **Becker**, 51 Wis. 2d at 665. His non-passive, physically confrontational conduct of approaching and targeting specific officers at close range while shouting in a loud, forceful manner could reasonably be construed as causing "substantial disorder" and "the invasion of the rights of others." Therefore, I conclude that Oleston's conduct in counts four and five involved penalizable non-speech elements and is not within the realm of First Amendment protection.

## CONCLUSION

¶42 In sum, for all of the above reasons, the conduct at issue in counts one through three falls within the protection of the First Amendment and may not be punished as disorderly conduct. On the other hand, the conduct at issue in counts four and five is not protected because it included non-speech elements that caused substantial disorder and invaded the rights of others. Accordingly, I affirm in part and reverse in part.

*By the Court.*—Judgment affirmed in part and reversed in part.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.